United States District Court
District of Maine

| | |
|---|---|
| Selcuk Karamanoglu<br><br>Plaintiff<br><br>v.<br><br>Town of Yarmouth, Michael Morrill in his capacity as Chief of Police of the Yarmouth Police Department, and Brian Andreasen, individually<br><br>Defendants | Civil Action No. |

**Complaint and Demand for Jury Trial**

Plaintiff Selcuk Karamanoglu, by and through his undersigned attorneys, hereby alleges against Defendants Town of Yarmouth, Michael Morrill in his official capacity as Chief of Police of the Yarmouth Police Department, and Brian Andreasen, individually, the following:

**Parties**

1.     Plaintiff Selcuk Karamanoglu is a resident of Cumberland County Maine, residing in the Town of Yarmouth, Maine.

2.     Defendant Town of Yarmouth is a political subdivision of the State of Maine, organized under the laws of the State of Maine.

3.     Defendant Michael Morrill is the chief of the Yarmouth Police Department (YPD). The YPD is a department of the Town of Yarmouth. Chief Morrill is sued in his official capacity.

4. Upon information and belief, the Town of Yarmouth and Chief Morrill were responsible for the policies, procedures, and practices implemented and enforced by the YPD through its agents and employees.

5. Defendant Brian Andreasen is a police officer employed by the YPD. At all times relevant to this Complaint, Defendant Andreasen was in uniform as a police officer, employed with the Town of Yarmouth, Maine and was acting within the scope of his employment and under color of the laws, statutes, ordinances, policies, customs and usages of the State of Maine and its political subdivisions, including the Town of Yarmouth.

**Jury Trial Demand**

6. Under Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all issues triable to a jury.

**Jurisdiction and Venue**

7. This action arises under 42 U.S.C. §§ 1983 and 1988. This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 (federal question). This Court has supplemental jurisdiction over Plaintiff's state law claims, which are related and form part of the same case or controversy as the federal claims, under 28 U.S.C. § 1367(a).

8. Venue is properly in the District of Maine under 28 U.S.C. § 1391(c)(3) because Plaintiff resides in Maine. Under Rule 3(b) of the Rules of this Court, this action is properly filed in Portland because the events occurred in Cumberland County.

**Facts**

9. On June 15, 2018, Karamanoglu traveled from his condo at Sugarloaf to his home in Yarmouth. When he arrived in Yarmouth, his ex-girlfriend "RH" was at his home.

2

Karamanoglu was surprised to see RH at the home because, when they spoke on the phone earlier in the day, RH stated she would be leaving the house.

10.     RH believed Karamanoglu was wearing a new shirt. She accused him of seeing another woman and lying to her about it. Karamanoglu got in his car and left because the RH refused to leave the premises. He returned 40 minutes later. By that point, RH had left.

11.     RH called Karamanoglu several hours later. During the call, Karamanoglu told RH that she was not to return to the house.

12.     Later that evening, RH snuck into Karamanoglu's home while he was sleeping. She walked into Karamanoglu's bedroom to confront him about suspected infidelities.

13.     RH retrieved and began searching through Karamanoglu's phone. She erupted into a rage after finding a message that she perceived as corroborated her suspicions and attacked Karamanoglu by hitting him with the garage door opener in her left hand and with the phone in her right hand. RH then smashed the garage door opener on the ground.

14.     Karamanoglu suffered several defensive wounds that are consistent with being struck by an assailant with a garage door opener.

15.     Karamanoglu told RH to leave the residence and attempted to escort her out of the house when she refused. RH physically resisted leaving and continuing striking Karamanoglu.

16.     RH and Karamanoglu ultimately reached the garage of the home. Because RH would not exit the house, Karamanoglu had no choice but to push her out of the garage door. She then stated, "I'm going to the police and you'll be in big trouble!"

17.     Later that evening, Officer Brian Andreasen was dispatched to the Yarmouth Police Department to meet with RH.

18.     RH told Andreasen that she had entered Karamanoglu's home, searched his phone, assaulted him, and refused to leave when he told her to do so. She also admitted to smashing a garage door opener on the floor. During the interview, RH also stated that she and Karamanoglu have separate residences.

19.     RH prepared a written statement at Andreasen's request. The statement reads as follows:

> I entered Selcuk's house w/out his knowledge. I was upset about a number of things and felt distrust. I entered his bedroom while he was sleeping. I walked around looking for his phone and couldn't find it. I asked him as I woke him up. He said find it yourself. When I did I realized he had communicated w/another girlfriend. I grew angry and broke a garage door opener. He said "get out!" I hit him on the chest and he began to grab my arms and push me out of the house. I didn't want to go so I pushed back. I asked why did he messaged her. He kept pushing me and grab my neck. I pushed back and he said get out of here "You Crazy Bitch," I grew even more frustrated and pushed him he grabbed me and pushed ~~out of the garage.d~~ through the steps, into the garage. I pushed him to the ground too. He again called me a Crazy Bitch and "get the fuck out of here." I asked him why did he phone that woman. He said get the "fuck out!"
>
> He pushed me out of the garage door and tried to close the door on me. I went back in and he pushed me again. I told him I would call the police and he said go ahead. I told him I needed my shoes and he threw them at my car.

20.     After RH completed her statement, Andreasen informed her that YPD would attempt to arrest Karamanoglu.

21.     Andreasen, accompanied by Ofc. Joshua Robinson, went to Karamanoglu's home. Karamanoglu explained to Andreasen that RH came into his house, woke him up, began attacking him, and that he was trying to remove her from the residence.

22.     Karamanoglu showed his defensive-wounds to the officers as evidence of what happened, which Andreasen disregarded by saying "ok, I saw them." Andreasen failed to note Karamanoglu's defensive-wounds in his police report.

23.     Andreasen placed Karamanoglu under arrest for domestic violence assault, 17-A M.R.S. § 207-A(1)(A) (Class D). Karamanoglu was released on cash bail, with special conditions of having no direct or indirect contact with RH and not to be at the premises of RH's home in Auburn, Maine. The bail bond was docketed with the Cumberland County Unified Criminal Docket on June 18, 2018. In turn, the court opened a new file in its criminal case management system, *State of Maine v. Selcuk Karamanoglu*, Docket No. CUMCD-CR-18-03197.

24.     Karamanoglu's arrest for domestic violence assault was published in the June 21, 2018 Yarmouth Police Beat in a local newspaper.

25.     The second entry in a Google search for "Selcuk Karamanoglu" links to the June 21, 2018 Yarmouth Police Beat, which reads "6/15 at 9:48 p.m. Selcuk Karamanoglu, 66, of Cornfield Point Road, was arrested on Cornfield Point Road by Officer Brian Andreasen on a charge of domestic violence assault."

26.     On June 16, 2018 at 9:30 p.m., Andreasen called RH to see how she was doing. She said that she remembered more details, and Andreasen asked her to write another statement. RH sent an e-mail at 10:48 p.m. reading:

Hi Brian,

5

Because I was in shock last night, I was not able to think clearly. I feel more aches and pains tonight and remember more details about the incident. As I had mentioned in my report last night, I drove to my boyfriends house because I felt insecure about something that had happened earlier in the day. When I arrived, I walked to the back bedroom where he was sleeping. He did not hear me enter the bedroom and I looked for his phone. I couldn't find it, so I woke him up and he said what are you doing here. I asked where his phone was and he said find it yourself. When I found it I saw that he had messaged with an old girlfriend that day. Prior to this he had told me that he had not been in contact with her. I went to his bedroom to ask him about it. I very confused, sad and angry. I held the phone up to him and said "you messaged her, why? He got up out of bed and didn't answer me. He went into the bathroom and I followed. He did not know what to say. I had a garage door opener in my hand and threw it onto the bathroom floor with anger. I had his phone in my other hand and wanted to throw it too but decided against it. he grabbed it from my hand and I said, "wait I want to see what else you said to her." He pushed my hand away and began to shove me out of the bathroom. I didn't want to go, so he grabbed my arms and tried to push me down the hallway. I hit him in his chest and asked him, "why,why did you message her."

Again he didn't know what to say and continued to push me down the hallway. I didn't want to leave, I wanted answers. I resisted but he kept pushing me and at one point I fell to the ground and got back up again. He pushed me again and again. Once into the kitchen I held onto the door frame so he couldn't push me out. I kept trying to resist and held onto his arms, as he pulled away, I scratched him by accident. he continued to push me and shove me until we got into the mud room and at that time he pushed me, so hard I fell to the ground. I grabbed his private area because I was scared at this point; he was even angrier now and pulled me up by my hair. He opened the door to his garage. I continued to resist and he then tried to throw me down the steps. I held onto him and we both fell onto the concrete garage floor. I got back and this time, he grabbed me by my throat. I grabbed his arms again and think I scratched his throat. He tried to shove me out of the garage so we could close the garage door and lock me out. I didn't want him to close me out and resisted again; he pushed me to the ground again but I pushed him back and he fell. I was able to get back up again and go closer to him to ask why he was doing this. 'He said, you crazy bitch get the fuck away from me." He threw me onto the payment [sic] just outside the garage. I told him I was going to the police but needed my shoes. He said "I don't give a fuck what you do." He picked up my shoes and threw them at my car. I got into my car shaking.

27.     YPD did not investigate or pursue any criminal charges against RH, even

though she had confessed to committing numerous crimes against Karamanoglu, including

a felony and a sex crime. RH's admitted criminal conduct included domestic violence

assault, 17 M.RS. § 207-A, aggravated criminal trespass, 17-A M.R.S. § 402-A(1)(A), criminal

mischief, 17-A M.R.S. § 806(1)(A), and unlawful sexual contact, 17-A M.R.S. § 255-A(1)(A).

28.     Karamanoglu incurred legal fees for the defense of the criminal summons. He

sent a request through counsel to the Cumberland County District Attorney's Office

requesting that the case be dropped. The attorney for the state sent an e-mail in response

on June 21, 2018, reading, "I have reviewed the case involving Mr. Karamanoglu and have

'no complainted' the case. It is clear from the report that any force used by your client was

in defense of his premises, or in self-defense. Please let me know if you have any questions.

Thanks."

29.     Emboldened by Karamanoglu's arrest, RH filed a protection from abuse

complaint against Karamanoglu. Karamanoglu retained counsel and the complaint was

dismissed by agreement at a hearing on a motion to dissolve.

30.     Another protection from abuse complaint arising from Karamanoglu's arrest

was filed by Karamanoglu's ex-wife ("CG"). The complaint was brought by CG individually

and on behalf of their minor son. The complaint asserted that Karamanoglu is a dangerous

person, as evidenced by his arrest for domestic violence assault against RH. The Maine

District Court ruled in Karamanoglu's favor after a full hearing on the merits.

31.     Karamanoglu suffered damages that were proximately caused by his

unlawful arrest, including but not limited to stress, fear, and embarrassment of being

arrested and subjected to a criminal domestic violence proceeding; reputational harm

arising from now being known as an individual who has been arrested for domestic

violence; defending against protection from abuse proceedings that were triggered by the

unlawful arrest; and legal fees associated with the criminal and protection from abuse proceedings.

32.     On September 28, 2018, Karamanoglu's counsel served a notice of claim under the Maine Tort Claims Act, 14 M.R.S. § 8107, upon the Clerk for the Town of Yarmouth, Chief Michael E. Morrill, and Officer Brian Andreasen.

## COUNT 1
### (42 U.S.C. § 1983 – Civil Rights Violation)
### (Officer Andreasen)

33.     Plaintiff realleges and incorporates by references all other allegations contained in this Complaint.

34.     Karamanoglu has a constitutional right to be free of arrest without probable cause under state and federal law. U.S. Const. amend IV; Me. Const. art. I, Sec. 5. It is clearly established that probable cause does not exist where a police officer knows that a justification defense would bar any prosecution. *See, e.g. Mazuka v. Rice Twp. Police Dep't*, 655 Fed. Appx. 892, 899 (3d Cir. 2016); *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *Prevost v. City of New York*, 2014 WL 6907560, at *3 (S.D.N.Y. Dec. 9, 2014). Similarly, the First Circuit has noted that a police officer may not "treat evidence of innocence with impunity." *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999).

35.     Acting under color of state law, Defendant Andreasen intentionally deprived Karamanoglu of his clearly established right to be free from arrest without probable cause.

36.     Defendant Andreasen's actions displayed a reckless or callous disregard of, or indifference to, Karamanoglu's right to be free of an unlawful arrest.

## COUNT 2
### (42 U.S.C. § 1983 – Civil Rights Violation)
### (Municipal Defendants)

37.     Plaintiff realleges and incorporates by references all other allegations contained in this Complaint.

38.     At all relevant times, municipal defendants had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of Defendant Andreasen. Such policies, practices, and customs were a direct and proximate cause of the damages and injuries complained herein.

39.     Upon information and belief, Defendant Morrill is the chief policymaker for the YPD. The YPD's policies fail to instruct officers to refrain from making arrests in circumstances where a suspect's actions would be justified by defense of property or defense of premises. Yarmouth Police Department Policy # 1013 at 3.

40.     After Karamanoglu's arrest, Andreasen communicated with Karamanoglu regarding the logistics of returning RH's property left at the Yarmouth residence. This suggests that Andreasen was not disciplined by the YPD for his conduct, was permitted to continue working on the case, and was acting in accordance with YPD practices.

41.     Other factors suggest that Defendant Andreasen's actions and handling of the Karamanoglu/RH investigation were in line with the practices of the YPD, and that the YPD failed to properly train and/or supervise Andreasen. Specifically, upon information and belief, Defendant Andreasen was accompanied by a second officer when making the unlawful arrest who did not intervene in the arrest; his police report describing the above events was approved by a lieutenant; and the YPD did not arrest or charge RH despite her confessions to committing crimes of domestic violence against Karamanoglu.

42.     Upon information and belief, the lieutenant who approved Andreasen's police report is a YPD veteran who was second in command of the YPD.

43.     Through the above policies, practices, customs, and failure to train/supervise, the municipal defendants caused the constitutional violations suffered by Karamanoglu and are liable for the result of Defendant Andreasen's conduct.

## COUNT 3
**(5  M.R.S. § 4681, *et seq.* – Maine Civil Rights Act)**
**(All Defendants)**

44.     Plaintiff realleges and incorporates by references all other allegations contained in this Complaint.

45.     In committing the acts complained of herein, Defendant Andreasen acted under color of state law and intentionally interfered, by threat of physical force or violence, with the Plaintiff's exercise and enjoyment of rights secured under the Fourth and Fourteenth Amendments of the United States Constitution, Article I, Sec. 5 of the Maine Constitution, and the laws of the State of Maine, including Plaintiff's right to be free from arrest without probable cause.

46.     Defendant Andreasen acted with malice in that the foregoing conduct was motivated by ill will towards Plaintiff or, if motivated by something other than ill will, was so outrageous that malice against Plaintiff can be implied.

47.     Through the above policies, practices, customs, and failure to train/supervise, the municipal defendants caused the constitutional violations suffered by Karamanoglu and are liable for the result of Defendant Andreasen's conduct.

## COUNT 4
### (Unlawful Arrest)
### (All Defendants)

48.     Defendant Andreasen unlawfully restrained Plaintiff Karamanoglu by arresting him without probable cause, and such restraint was without legal justification and against Karamanoglu's will.

49.     Defendants acted with malice in that the foregoing conduct was motivated by ill will towards Plaintiff or, if motivated by something other than ill will, was so outrageous that malice against Plaintiff can be implied.

WHEREFORE, Plaintiff respectfully requests that this Court:

(A)     Determine the losses, injuries and damages sustained by Plaintiff along with such pre-judgment and post-judgment interest as may be allowed by law;

(B)     Award an appropriate remedy including, but not limited to, compensatory damages, punitive damages, and civil penalties on those claims for which such damages and penalties are recoverable;

(C)     Award Plaintiff his costs and disbursements of this suit, including, but not limited to, reasonable attorneys' fees and any reasonable accountants' or experts' fees;

(D)     Grant Plaintiff such other and further relief as this Court may deem just and proper, including, without limitation, equitable and injunctive relief.

Plaintiff,
By his Attorneys,


Dated: January 14, 2019                    /s/ Gene R. Libby
                                           Gene R. Libby, Esq., Bar No. 427
                                           Libby O'Brien Kingsley & Champion, LLC
                                           62 Portland Road, Suite 17
                                           Kennebunk, ME 04043
                                           Tel:  (207) 985-1815
                                           glibby@lokllc.com

Dated: January 14, 2019                    /s/ Tyler J. Smith
                                           Tyler J. Smith, ME Bar # 4526
                                           Libby O'Brien Kingsley & Champion, LLC
                                           62 Portland Road, Suite 17
                                           Kennebunk, ME 04043
                                           Tel:  (207) 985-1815
                                           tsmith@lokllc.com


### Certificate of Service

I certify that I served the foregoing document upon all counsel of record via the Court's ECF system and U.S Mail.

Dated: January 14, 2019                    /s/ Gene R. Libby
                                           Gene R. Libby, Esq., Bar No. 427