# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

SELCUK KARAMANOGLU,                )
                              )
    Plaintiff            )
                              )
v.                                )     No. 2:19-cv-00031-JHR
                              )
TOWN OF YARMOUTH, et al.,          )
                              )
    Defendants           )

## MEMORANDUM DECISION ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT[1]

The defendants, the Town of Yarmouth ("Town"), Daniel Gallant in his capacity as Chief of Police of the Yarmouth Police Department ("YPD") (together, the "Municipal Defendants"), and Brian Andreasen individually, move for summary judgment as to plaintiff Selcuk Karamanoglu's claims that (i) Andreasen arrested him for domestic violence assault without probable cause in violation of his federal and state constitutional rights when he failed to recognize that the plaintiff had a justification defense that would bar any prosecution, and (ii) the Municipal Defendants are liable for that alleged misconduct. *See* Defendants' Motion for Summary Judgment ("Motion") (ECF No. 33) at 1, 7-19.[2]  I grant the Motion, concluding, for the reasons that follow, that, (i) even on the record viewed in the light most favorable to the plaintiff, Andreasen had no duty to recognize that the plaintiff had a justification defense, (ii) in the

---

[1] The parties have agreed to have me preside over all proceedings in this action, including the entry of judgment.  ECF No. 9.
[2] The plaintiff originally named Michael Morrill as the defendant Chief of Police.  *See* Complaint and Demand for Jury Trial ("Complaint") (ECF No. 1) at 1.  After Morrill retired from that position, the defendants moved to substitute the new Chief, Daniel Gallant, *see* ECF No. 15, and I granted that motion, *see* ECF No. 20.  After the defendants filed the instant motion, the parties filed a Stipulation of Dismissal of Count 4, *see* ECF No. 38, leaving in play Counts 1 (a claim against Andreasen pursuant to 42 U.S.C. § 1983 for arrest without probable cause in violation of the Fourth Amendment to the U.S. Constitution), 2 (a companion claim against the Municipal Defendants pursuant to section 1983), and 3 (a claim against all of the defendants pursuant to the Maine Civil Rights Act, 5 M.R.S.A. § 4681 *et seq.*, for arrest without probable cause in violation of Article I, § 5 of the Maine Constitution), *see* Complaint ¶¶ 33-47.

alternative, Andreasen is entitled to qualified immunity, (iii) the absence of an underlying constitutional violation is fatal to the plaintiff's claims against the Municipal Defendants, and, (iv) in the alternative, the plaintiff fails to generate a triable issue that the Municipal Defendants displayed the requisite deliberate indifference to his constitutional rights.

## I.   Applicable Legal Standards

### A.   Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'" *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAm. Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with

sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Borges ex rel.*

*S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  Factual Background

### A.  Requests to Strike Statements of Fact

As a threshold matter, I resolve the defendants' objections to, and requests to strike, a number of the plaintiff's statements of additional material facts in whole or part.

The defendants object to paragraphs 2, 3, 10, 19, 20, 21, 33, 40, 42, 45, 46, 47, 48, 49, 50, 51, 52, 68, 69, and 78 of the Plaintiff's Statement of Additional Material Facts ("Plaintiff's Additional SMF"), commencing on page 26 of the Plaintiff's Opposing Statement of Material Facts and Additional Statement of Material Facts ("Plaintiff's SMF Response") (ECF No. 36), on the basis that there is no evidence that Andreasen knew the information at issue at the time of the plaintiff's arrest, rendering it immaterial to the determination of probable cause.  *See* Defendants' Reply Statement of Material Facts ("Defendants' Reply SMF") (ECF No. 40) ¶¶ 2-3, 10, 19-21, 33, 40, 42, 45-52, 68-69, 78; *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) ("A police officer has probable cause when, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. . . .  The only relevant facts are those known to the officer.") (citation and internal punctuation omitted).  The plaintiff has not availed himself of the opportunity to contest that characterization, *see generally* CM/ECF Docket; Loc. R. 56(e), and the statements at issue, on their face, do not indicate that Andreasen knew this information as of the time of the plaintiff's arrest.  Accordingly, with two exceptions – Plaintiff's Additional SMF ¶¶ 21 and 78 – the

defendants' objections to those statements are **SUSTAINED**, and they are **STRICKEN**.  The defendants' objections to Plaintiff's Additional SMF ¶ 21, which discusses a police report prepared by Andreasen reflecting events leading up to the arrest, and ¶ 78, which discusses a relevant YPD policy, are **OVERRULED**.[3]

The defendants object to all or portions of paragraphs 23 and 39 of the Plaintiff's Additional SMF on the basis that they consist of argument, speculation, or subjective belief rather than facts.  *See* Defendants' Reply SMF ¶¶ 23, 39.  Again, the plaintiff has not availed himself of the opportunity to dispute that characterization, *see generally* CM/ECF Docket; Loc. R. 56(e), which, in any event, is a fair one on the face of the statements at issue.  The defendants' objections to those statements accordingly are **SUSTAINED**, and they are **STRICKEN**.  *See, e.g., Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56-57 (1st Cir. 2011) (district court that granted summary judgment in favor of defendant did not err in ignoring plaintiff's "items which, though labeled as facts, are nothing more than speculation or argumentation").

The defendants object to paragraphs 25 and 26 of the Plaintiff's Additional SMF on the basis that they set forth portions of documents containing multiple assertions of fact in violation of Local Rule 56(c).  *See* Defendants' Reply SMF ¶¶ 25-26.  These objections are **OVERRULED**.  Local Rule 56(c) does not require that every sentence in a single quoted document be set forth in a separate statement of material facts.

---

[3] The defendants object to paragraphs 45 through 52 of the Plaintiff's Additional SMF on the additional basis that the YPD's internal investigation of the incident at issue has no bearing on the plaintiff's municipal liability claim, which focuses on the Municipal Defendants' conduct leading up to that incident.  *See* Defendants' Reply SMF ¶¶ 45-52.  I agree.  *See, e.g., Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011) ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates.") (citation and internal punctuation omitted).

The defendants object that paragraphs 62 and 64 of the Plaintiff's Additional SMF are unsupported by the record citations provided.  *See* Defendants' Reply SMF ¶¶ 62, 64.  I agree. These objections, accordingly, are **SUSTAINED**, and those paragraphs are **STRICKEN**.

The defendants object that paragraph 80 of the Plaintiff's Additional SMF, which concerns consideration of a person's gender in making an arrest, is irrelevant because the plaintiff makes no claim that he was treated differently because of his gender.  *See* Defendants' Reply SMF ¶ 80.  I agree and, accordingly, the objection is **SUSTAINED**.  Plaintiff's Additional SMF ¶ 80 is **STRICKEN**.

## B.  Factual Background

The parties' remaining statements of material facts, credited to the extent that they bear on the disposition of this motion and are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of the plaintiff as the nonmovant, reveal the following.[4]

At all times relevant to this matter, the plaintiff lived at 90 Cornfield Point in Yarmouth, Maine, Stipulated Facts ("SF") (ECF No. 32) ¶ 1, and defendant Andreasen was employed by the Town as a police officer for the YPD and was certified to work as a full-time law enforcement officer by the State of Maine, *id*. ¶¶ 2-3.  Morrill was the Chief of Police of the YPD until he retired on June 14, 2019, and was certified to work as a full-time law enforcement officer by the State of Maine.  *Id*. ¶¶ 4-5.  At all times relevant to this matter, Gallant was employed as a police officer by the Town and was certified to work as a full-time law enforcement officer by the State of Maine.

---

[4] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise.  To the extent that I have incorporated one side's qualification in whole or in part into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.  To the extent that the defendants have denied all or a portion of a statement, I have set forth the plaintiff's version to the extent supported by the citation(s) given.

*Id*. ¶¶ 6-7.  Gallant was a sergeant until approximately September 2018, when he became a

lieutenant, and he became the Chief of Police of the YPD on June 14, 2019.  *Id*. ¶ 6.

The plaintiff was awoken in his bed in his home on the evening of June 15, 2018, to Rose

Heikkinen standing in his bedroom, demanding to see his phone so she could check it.  Plaintiff's

Additional SMF ¶ 1; Defendants' Reply SMF ¶ 1.  After finding the phone, Heikkinen blocked the

plaintiff in the bathroom, confronted him with an old message from an ex-girlfriend, and began

demanding answers about the message.  *Id*. ¶ 4.  Heikkinen then began striking the plaintiff with

the garage door opener and the phone, causing physical injuries to him.  *Id*. ¶ 5.  She then smashed

the garage door opener on the floor and lifted the plaintiff's phone into the air.  *Id*.  The plaintiff

grabbed Heikkinen's wrists to stop her from hitting him and told her to get out of the house.  *Id*.

¶ 6.  Heikkinen refused to leave and kept trying to hit the plaintiff as he pushed her through the

house toward the doorway.  *Id*. ¶ 7.  When Heikkinen would get a hand free, she would either hit

the plaintiff or grab something to resist leaving.  *Id*. ¶ 8.  When they reached the garage, Heikkinen

ripped the plaintiff's shirt and pushed him to the ground.  *Id*. ¶ 9.  Just before leaving, Heikkinen

yelled at the plaintiff that she was going to the police.  *Id*. ¶ 11.  Heikkinen also called the plaintiff

from the police station to let him know she was there and asked him again, "why did you text her?"

*Id*. ¶ 12.

Heikkinen went to the Yarmouth police station to report that she had been involved in a

fight with her boyfriend, the plaintiff, and that it got physical.  SF ¶ 8.  Because it was late in the

evening beyond the normal business hours of the Town, Heikkinen spoke with dispatch on a phone

located in the lobby of the Yarmouth police station.  *Id*. ¶ 9.  Dispatch for the Yarmouth Police

Department is performed by the Falmouth Police Department.  *Id*. ¶ 10.  Andreasen was on duty

on June 15, 2018, patrolling.  *Id*. ¶ 11.  At approximately 9:48 pm, he was directed by dispatch to

return to the Yarmouth Police station to meet with a woman (Heikkinen) who had come to the station to report that she was involved in a domestic incident. *Id*. When Andreasen pulled into the parking lot of the Yarmouth Police station, there was one other vehicle in the parking lot, which he assumed belonged to the complainant, Heikkinen. *Id*. ¶ 12.

Andreasen ran the vehicle's license plate through the Mobile Data Terminal in his patrol car. *Id*. ¶ 13. The Maine Bureau of Motor Vehicle response record showed Heikkinen's registration and her residence as 90 Cornfield Point Road in Yarmouth, Maine, which is the plaintiff's address. *Id*. ¶ 13. While at the Yarmouth police station, Andreasen interviewed Heikkinen and took photographs of her. *Id*. ¶ 14. Andreasen first met with Heikkinen in the lobby of the police station and observed that she was emotional and at times sobbing; however, she was able to articulate to him what had happened earlier that night. Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("Defendants' SMF") (ECF No. 34) ¶ 5; Plaintiff's Opposing Statement of Material Facts ("Plaintiff's Opposing SMF"), commencing on page 1 of Plaintiff's SMF Response, ¶ 5. Andreasen observed that Heikkinen had blood on her clothing and that she was holding onto the right side of her ribs and complaining of pain in her ribcage. *Id*. ¶ 6.[5] Andreasen asked Heikkinen if she wanted to be evaluated by Yarmouth Rescue and, while she initially declined to be seen, she was later seen by Yarmouth Rescue but refused transport to the hospital. *Id*. ¶ 7.

Andreasen learned from Heikkinen that 90 Cornfield Point was the plaintiff's address and the place where the domestic incident she was reporting had occurred. *Id*. ¶ 2. Heikkinen told Andreasen that she had been dating the plaintiff off and on for approximately three years and had

---

[5] The plaintiff qualifies this statement, asserting, to the extent supported by the record citations given, that Andreasen did not know whose blood was on Heikkinen's clothing.

8

a sexual relationship with him.  *Id*. ¶¶ 8, 10.  Heikkinen told Andreasen that, earlier in the afternoon, she was at 90 Cornfield Point when she noticed that the plaintiff was wearing a new shirt and asked him about it because she suspected he was seeing someone else.  *Id*. ¶ 11.  The plaintiff denied that the shirt was new or that he was seeing anyone else, and Heikkinen left 90 Cornfield Point to go to dinner with a friend in Lisbon.  *Id*. ¶ 12.  Heikkinen explained to Andreasen that she was very upset during dinner because she kept thinking that the plaintiff was seeing someone else.  *Id*. ¶ 13.

Heikkinen told Andreasen that, after she finished dinner, she drove back to 90 Cornfield Point and let herself into the house without the plaintiff's knowledge using the garage door opener in her vehicle.  *Id*. ¶ 14.[6]  She told Andreasen that she went into the bedroom where the plaintiff was sleeping and told him she wanted to see his cell phone.  *Id*. ¶ 15.  The plaintiff told her to find it herself, and when she did so, she saw that he had been communicating with an ex-girlfriend.  *Id*. ¶ 16.  Heikkinen told Andreasen that she became angry, broke her garage door opener on the floor, and hit the plaintiff on his chest, after which he grabbed her by the arms, pushed her, and told her to get out of the house.  Plaintiff's Additional SMF ¶ 25; Defendants' Reply SMF ¶ 25.

Heikkinen told Andreasen that she did not want to leave, so she pushed the plaintiff back, and he grabbed her neck.  Defendants' SMF ¶ 19; Plaintiff's Opposing SMF ¶ 19.  She told Andreasen that she never had difficulty breathing when the plaintiff grabbed her neck.  Plaintiff's Additional SMF ¶ 25; Defendants' Reply SMF ¶ 25.  Andreasen observed blotchy spots on the skin around Heikkinen's neck and face.  Defendants' SMF ¶ 20; Plaintiff's Opposing SMF ¶ 20.  Heikkinen told Andreasen that the plaintiff kept telling her to get out of the house and was physically pushing her out of the house.  *Id*. ¶ 21.  She told Andreasen that she fought back, and

---

[6] My recitation incorporates the plaintiff's denial in part and qualification in part of this statement.

when they got to the garage, the plaintiff pushed her down the stairs onto the concrete floor, which

was when she believed she hurt her ribs.  *Id*. ¶ 22.  Heikkinen also explained to Andreasen that the

plaintiff was emotionally abusive to her, had destroyed property belonging to her in the past, and

often did not let her have access to money.  *Id*. ¶ 23.[7]

Andreasen asked Heikkinen if she would be willing to complete a voluntary statement and,

while hesitant at first, she agreed to do so.  *Id*. ¶ 24.  That statement read as follows:

> I entered Selcuk's house w/out his knowledge.  I was upset about a number of things
> and felt distrust.  I entered his bedroom where he was sleeping.  I walked around
> looking for his phone and couldn't find it.  I asked him as I woke him up.  He said
> find it yourself.  When I did I realized he had communicated w/another girlfriend.
> I grew angry and broke a garage door opener.  He said "get out!"  I hit him on the
> chest and he began to grab my arms and push me out of the house.  I didn't want to
> go so I pushed back.  I asked why did he messaged her.  He kept pushing me and
> grab my neck.  I pushed back and he said get out of her "You Crazy Bitch," I grew
> even more frustrated and pushed him he grabbed me and pushed ~~out of the garage.d~~
> down the steps, into the garage.  I pushed him to the ground too.  He again called
> me a Crazy Bitch and "get the fuck out of here."  I asked him why did he phone
> that woman.  He said get the "fuck out!"
>
> He pushed me out of the garage door and tried to close the door on me.  I went back
> in and he pushed me again.  I told him I would call the police and he said go ahead.
> I told him I needed my shoes and he threw them at my car.

Plaintiff's Additional SMF ¶ 26; Defendants' Opposing SMF ¶ 26.[8]  Heikkinen listed "31 Tyler

Street" as her address in the voluntary statement.  SF ¶ 16.

Andreasen read Heikkinen's statement before arresting the plaintiff.  Plaintiff's Additional

SMF ¶ 27; Defendants' Reply SMF ¶ 27.  Heikkinen also told Andreasen that she was "more

aggressive" than the plaintiff, meaning that when the plaintiff was trying to shove her out of the

house, she was resisting with assertiveness because she wanted answers and did not want him to

---

[7] The plaintiff qualifies this statement, asserting, to the extent supported by the citations given, that Andreasen did not
know any of the details of how the plaintiff allegedly was emotionally abusive, had destroyed her belongings, and
denied her access to money, and Heikkinen refused to answer any questions about those issues.

[8] I have corrected a misquotation of one word in the statement.

push her out.  *Id.* ¶ 28.[9]  Andreasen also photographed Heikkinen's injuries.  Defendants' SMF ¶ 25; Plaintiff's Opposing SMF ¶ 25.

Andreasen spoke with Officer Joshua Robinson at the YPD concerning Heikkinen's complaint.  SF ¶ 17.  Andreasen spoke with Robinson about his decision to arrest the plaintiff by relying on the substance of his discussion with Heikkinen and his conclusion that the plaintiff was the predominant aggressor.  Plaintiff's Additional SMF ¶ 30; Defendants' Reply SMF ¶ 30.[10] Robinson concurred with Andreasen's assessment.  *Id.*  The decision to arrest the plaintiff was made before Andreasen and Robinson left the YPD and without investigating the plaintiff's side of the story.  *Id.* ¶ 31.

Andreasen was aware that the plaintiff told Heikkinen to leave 90 Cornfield Point immediately after Heikkinen hit him on the chest and broke the garage door opener on the floor, which was before the plaintiff used any physical force against Heikkinen.  *Id.* ¶ 34.  According to Andreasen's narrative report, Heikkinen stated that she broke the plaintiff's garage door opener on the floor and hit him on the chest before the plaintiff grabbed her by the arms, pushed her, and told her to get out of the house.  *Id.* ¶ 35.

Later on the evening of June 15, 2018, Andreasen and Robinson each travelled in separate cruisers to 90 Cornfield Point Road in Yarmouth, where Andreasen ultimately arrested the plaintiff for domestic violence assault.  SF ¶ 18.  They asked the plaintiff what had happened.  Plaintiff's Additional SMF ¶ 13; Defendants' Reply SMF ¶ 13.  The plaintiff was cooperative with the police. *Id.* ¶ 14.  The plaintiff summarized what had happened and stated that Heikkinen was attacking him, and he was trying to remove her from his residence.  *Id.* ¶ 15.  Andreasen said, "you can't

---

[9] My recitation incorporates in part the defendants' qualification.
[10] The defendants qualify this statement, asserting, *inter alia*, that Robinson also saw Heikkinen that night at the police station and personally observed a mark on her neck under her chin.

push anybody, that's domestic violence," and placed the plaintiff under arrest.  *Id*.  The plaintiff was arrested either shortly before or shortly after 12:00 a.m. on June 16, 2018, but the parties agree that any discrepancy in the exact time of the arrest is not material.  SF ¶ 18.

The plaintiff asked what the officers were doing, stating that Heikkinen was hitting him, and showed them wounds on his arm, hand, and chest.  Plaintiff's Additional SMF ¶ 16; Defendants' Reply SMF ¶ 16.  Andreasen did not want to listen to what the plaintiff was saying. *Id*. ¶ 17.  Andreasen stated, "okay, we saw them," in reference to the plaintiff's injuries and arrested him for domestic violence assault, 17-A M.R.S.A. § 207-A(1)(A).  *Id*. ¶ 18.  The plaintiff was charged only with domestic violence assault as neither Andreasen nor Robinson believed that the legal definition of strangulation had been met.  *Id*. ¶ 38.  When Andreasen spoke with the plaintiff, he asked him about pushing Heikkinen down the stairs but did not ask him about the alleged neck grab.  *Id*. ¶ 41.

At his deposition, Andreasen agreed that, as the owner of the Yarmouth home, the plaintiff had the right to exclude Heikkinen from the property.  *Id*. ¶ 32.  *Id*.[11]  Andreasen testified that all of the force used by the plaintiff other than "grabbing the neck" was justified.  *Id*. ¶ 36.

Robinson was present for the plaintiff's arrest but did not speak to him.  SF ¶ 19. Andreasen transported the plaintiff to the Cumberland County Jail.  *Id*. ¶ 20.  Bail was set at approximately 3:10 a.m. on June 16, 2018, and the plaintiff was released shortly thereafter.  *Id*. ¶ 21.  Andreasen prepared a police report regarding the plaintiff's arrest.  *Id*. ¶ 22.  Andreasen's police report was approved by Lt. Dean Perry.  *Id*. ¶ 23.  The report indicated that "Rose lives in Auburn during the work week but stays every weekend at Selcuk's."  Plaintiff's Additional SMF

---

[11] My recitation incorporates the defendants' qualification to the extent supported by the citations given.

¶ 22; Defendants' Reply SMF ¶ 22.  The report also stated that Heikkinen's address was 31 Tyler Street in Auburn, Maine, and referred to her residency status as "Non Resident."  *Id*. ¶ 23.

The Maine Criminal Justice Academy ("MCJA") is responsible for the development and implementation of training of all law enforcement officers in the State of Maine and has standardized the initial and annual training requirements of all officers.  Defendants' SMF ¶ 45; Plaintiff's Opposing SMF ¶ 45. All Yarmouth police officers are initially trained at the MCJA and must complete the MCJA Basic Law Enforcement Training Program unless they have significant law enforcement experience, in which case they must seek and receive a waiver from the MCJA. *Id*. ¶ 46.  The MCJA provides training in, among other things, federal and state constitutional law, lawful arrests, Maine criminal laws and statutory defenses, civil rights, domestic violence, and report writing.  *Id*. ¶ 47.

The MCJA training provides a comprehensive module on domestic violence, which includes all aspects of responding to domestic violence complaints, including the prevalence and nature of domestic abuse, the definition of family or household members, Maine criminal statutes, and the "predominant aggressor" determination.  *Id*. ¶ 48.  The predominant aggressor determination is used when there is an indication that both parties have used some physical force against each other during a domestic violence incident.  *Id*. ¶ 49.  In these situations, the MCJA teaches that the officer is required to determine the predominant aggressor and take the appropriate action.  *Id*. ¶ 50.  The predominant aggressor determination is intended to ensure that the abuser, and not the victim, is held accountable and to address inappropriate dual arrests or arrests of victims. *Id*. ¶ 51.  The terminology has changed over the years, but relevant here, when both parties have committed some sort of abuse toward each other, the "predominant aggressor" is defined as "[t]he person who is most responsible for the abuse, uses the higher level of abuse, has an

established history of abuse in the relationship, and who represents the more serious threat of abuse, when both parties have committed some sort of abuse toward each other." *Id*. ¶ 52; Plaintiff's Additional SMF ¶ 76; Defendants' Reply SMF ¶ 76.

For many years, as part of its training, the MCJA has used the Predominant Aggressor Analysis Decision Tree, which was designed to guide law enforcement officers in determining the predominant aggressor. Defendants' SMF ¶ 53; Plaintiff's Opposing SMF ¶ 53. Yarmouth police officers are always trained, at the MCJA and by the YPD, to consider the totality of the circumstances when determining the predominant aggressor and making the decision as to whether probable cause to arrest exists. *Id*. ¶ 54. All Yarmouth officers must satisfy all of the requirements mandated by the MCJA to maintain their certification with the State of Maine as law enforcement officers, including completing, at a minimum, all of the training mandated by the MCJA each year. *Id*. ¶ 55. After graduating from the MCJA, or in limited exceptions receiving a waiver from the MCJA, all Yarmouth police officers receive additional training through the field training program with the YPD. *Id*. ¶ 56.

Andreasen graduated from the MCJA basic law enforcement training program in May 2012. *Id*. ¶ 59. He then completed the field training program with the YPD, receiving approximately 15 weeks of additional training on, among other things, lawful arrests with and without warrants, responding to domestic violence complaints, use of force in defense of self or another person or in defense of premises, use of force in property offenses, criminal trespass, investigations, and report writing. *Id*. ¶ 60.[12] Since graduating from the MCJA and obtaining his certification with the State, Andreasen has completed all of the training mandated by the MCJA. *Id*. ¶ 61. Yarmouth does not provide individual training regarding defense of premises or defense

---

[12] The plaintiff denies this statement, but his assertions do not controvert it.

14

of property after an officer completes his or her field training, unless there is a change in state law. Plaintiff's Additional SMF ¶ 54; Defendants' Reply SMF ¶ 54.  At his deposition, Andreasen did not recall having any training that an individual is entitled to use reasonable force in defense of his home or property in a domestic violence situation.  *Id.* ¶ 55.[13]

On May 7, 2018, Andreasen received additional domestic violence training that was presented by Through These Doors, a domestic violence advocacy agency, and Daniel Young, a Gorham Police Department Detective Sergeant who has been a law enforcement officer for 25 years and has received advanced training on domestic violence.  Defendants' SMF ¶¶ 63-64; Plaintiff's Opposing SMF ¶¶ 63-64.  Young has co-taught the domestic violence course at the basic law enforcement training program at the MCJA since approximately 2010 and, since approximately 2011, has conducted dozens of in-service domestic violence trainings for law enforcement agencies across the State of Maine.  *Id.* ¶ 65.  The May 7, 2018, training included training on determining the predominant aggressor, consistent with how it is taught at the MCJA, probable cause, self-defense, strangulation, and determining whether the involved parties are family or household members as defined under Maine law.  *Id.* ¶ 66.

The MCJA sets certain minimum standards for policies and procedures for law enforcement agencies in Maine, including minimum standards for domestic abuse/domestic violence policies.  *Id.* ¶ 67.  As of July 15, 2016, the MCJA Board of Trustees adopted the Minimum Standards Domestic Violence Policy (the "DV Minimum Standards"), which law enforcement agencies must adopt or incorporate into their domestic violence or domestic abuse policies.  *Id.* ¶ 68.  The DV Minimum Standards require, among other things, that law enforcement

---

[13] My recitation incorporates the defendants' qualification.

agencies include a requirement that it is the responsibility of an officer to determine the predominant aggressor and take the appropriate action.  *Id*. ¶ 69.

At the time of the plaintiff's arrest, the YPD maintained Standard Operating Procedure ("SOP") # 1013, "Domestic Abuse," which was last revised in April 2016.  Plaintiff's Additional SMF ¶ 71; Defendants' Reply SMF ¶ 71.  The policy incorporates the DV Minimum Standards. Defendants' SMF ¶ 70; Plaintiff's Opposing SMF ¶ 70.  All Yarmouth officers receive training on YPD policies, including SOP # 1013.  *Id*. ¶ 71.

Morrill did not know if the information in the May 7, 2018, training was consistent with or conflicted with Maine law, even though "determining predominant aggressor training is a supplement to the [domestic abuse] policy."  Plaintiff's Additional SMF ¶ 58; Defendants' Reply SMF ¶ 58.  Those training materials do not include a component advising officers that they must also consider defense of premises as a possible justification defense.  *Id*. ¶ 59.  Those training materials also reference "Male Privilege" as part of a Power and Control Wheel that is included in a slide that was part of the training and lists other factors such as using children, using isolation, using emotional abuse, etc.  *Id*. ¶ 60.[14]  The predominant aggressor flow chart does not instruct officers to consider whether a person was acting in defense of premises or defense of property, as those terms are defined by 17-A M.R.S.A. §§ 104-05.  *Id*. ¶ 61.  Young, one of the presenters at the May 2018 training, stated that "[d]efense of premises and defense of property are not included on the Decision Tree, if it's already been determined that it is a situation where the parties are family or household members, then each party would have the right to be on the premises and right to the property."  *Id*. ¶ 65.[15]  Young and Annis reviewed with the officers "that family or household members include, for purposes of domestic violence assault and other DV crimes, spouses and

---

[14] My recitation incorporates the defendants' qualification.
[15] My recitation incorporates the defendants' qualification.

domestic partners, individuals presently or formerly living together and individuals who are, or previously were, sexual partners." *Id.* ¶ 66.

Andreasen and Robinson relied on the information from the 2018 training when deciding to arrest the plaintiff, and Andreasen understood his arrest decision to be consistent with his training and the SOPs of the department. *Id.* ¶ 63. Morrill testified that he did not know why defense of premises and defense of property are not contained in the predominant aggressor flow chart. *Id.* ¶ 67.

At the time of the plaintiff's arrest, SOP # 1013 was in effect. *Id.* ¶ 71. All SOPs are approved and issued under the authority of the Chief of Police, although some policies, including the DV Minimum Standards, must be adopted and implemented by all law enforcement agencies in Maine. *Id.* ¶ 72.[16] The YPD also has a policy regarding arrests in general, SOP # 1006, but that policy states that "in domestic violence cases, the officer shall follow the procedures outlined in SOP 1013." *Id.* ¶ 73.

SOP # 1013 provides that an officer should "[a]rrest the abuser, based upon existing probable cause and consistent with this policy and state law" and, "[i]n cases where both parties have committed some sort of violence toward each other, officers should determine if *self defense* was used by one of the parties involved and should arrest the *Predominant Aggressor*." *Id.* ¶ 75 (emphasis in SMF). "Abuse" is defined in the policy as "[t]he infliction of injury, unreasonable confinement, intimidation, or cruel punishment that causes or is likely to cause physical harm, pain, or mental anguish, sexual abuse or sexual exploitation, or deprivation of essential needs." *Id.* ¶ 77. SOP # 1013 does not require a police officer to consider whether a person acted in defense of premises or in defense of property and fails to define either term. *Id.* ¶ 78. The arrest guidelines

---

[16] My recitation incorporates in part the defendants' qualification.

under SOP # 1013 provide that an officer may not consider "[t]he sobriety, marital, or emotional status, sexual orientation, racial, cultural, social, political, or professional position of the involved parties" or the "[o]wnership/tenancy rights of either party[.]"  *Id.* ¶ 79.

Prior to receiving the Notice of Claim in this case in approximately September 2018, former Police Chief Morrill was not aware of any complaints made against Yarmouth police officers relating to alleged unlawful arrests for domestic violence assault or Yarmouth officers' determination of the predominant aggressor in domestic violence cases.  Defendants' SMF ¶ 75; Plaintiff's Opposing SMF ¶ 75.  Before he received the Notice of Claim in this case, Morrill was not aware of any complaints made against Andreasen for any reason.  *Id.* ¶ 76.

## III.  Discussion

The plaintiff alleges that Andreasen arrested him without probable cause in violation of his federal and state constitutional rights and that the Municipal Defendants are liable for that deprivation by virtue of their policies and/or failure to train/supervise Andreasen.  *See* Complaint ¶¶ 33-47.  However, as the defendants persuasively argue, *see generally* Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment ("Reply") (ECF No. 39) at 1-4, the plaintiff fails to generate a triable issue that he was arrested without probable cause, which is also fatal to his bid to hold the Municipal Defendants liable, *see* Motion at 15-16.  In the alternative, as the defendants assert, *see* Reply at 4-7, even if probable cause was lacking, the plaintiff fails to demonstrate a triable issue that Andreasen should be denied qualified immunity or that the Municipal Defendants acted with the requisite deliberate indifference.

### A.  Officer Andreasen

The First Circuit has explained:

When a defendant invokes qualified immunity, an inquiring court typically engages in a two-step pavane.  First, the court must determine whether the plaintiff's version of the facts makes out a violation of a protected right.  Second, the court must

18

> determine whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct.  The second step itself has two sub-parts.  Sub-part one requires the plaintiff to identify either controlling authority or a consensus of cases of pervasive authority sufficient to signal to a reasonable official that particular conduct would violate a constitutional right.  Sub-part two requires us to consider whether a reasonable official in the defendant's position would have known that his conduct violated the established rule.  These inquiries are carried out with the understanding that qualified immunity is meant to shield all but the plainly incompetent or those who knowingly violate the law.

*Norton v. Rodrigues*, 955 F.3d 176, 184 (1st Cir. 2020) (citations and internal punctuation omitted).  "Taken together, these steps normally require that, to defeat a police officer's qualified immunity defense, a plaintiff must identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) (citations and internal quotation marks omitted).  "Although such a case need not arise on identical facts, it must be sufficiently analogous to make pellucid to an objectively reasonable officer the unlawfulness of his actions." *Id*. (footnote and citations omitted).  *See also, e.g., District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. . . .  While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate[,]" but for "the rare obvious case" in which "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.") (citations and internal quotation marks omitted).

### 1.  Probable Cause for Arrest

"The Fourth Amendment protects the right of the people to be secure in their persons . . . against unreasonable . . . seizures." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (internal punctuation omitted).  "[A] warrantless arrest by a law [enforcement] officer is reasonable under

the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Id.*[17]

Probable cause to effectuate an arrest "exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect is implicated in its commission." *United States v. Flores*, 888 F.3d 537, 543 (1st Cir. 2018) (citation and internal quotation marks omitted). "Probable cause must be assessed on the basis of the totality of the circumstances." *Id.* "Probable cause is not a high bar" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (citations and internal quotation marks omitted). The test of whether probable cause exists is an objective one: "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck*, 543 U.S. at 153. "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* (citation and internal quotation marks omitted).

In Maine, a police officer may make a warrantless arrest if, as relevant here, he or she has probable cause to believe that a person has committed or is committing the crime of domestic violence assault. *See* 17-A M.R.S.A. § 15(1)(A)(5-B) (Westlaw through 2019 2d Reg. Sess.). A person is guilty of the crime of domestic violence assault if that person "intentionally, knowingly or recklessly causes bodily injury or offensive physical contact to another person" who is a "family or household member[]," defined, as relevant here, to include "individuals presently or formerly

---

[17] The parties agree that analysis of the plaintiff's federal constitutional claim is dispositive of his state constitutional claim. *See* Motion at 7; Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Opposition") (ECF No. 35) at 4 n.1; *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007). Hence, I do not separately discuss it.

living together and individuals who are or were sexual partners." *Id*. §§ 207, 207-A (Westlaw through 2019 2d Reg. Sess.); 19 M.R.S.A. § 4002(4) (Westlaw through 2019 2d Reg. Sess.).

The decision to arrest the plaintiff was made before Andreasen and Robinson left the YPD and without investigating the plaintiff's side of the story. On the undisputed facts known to him at that time, Andreasen had probable cause to believe that the plaintiff had committed the crime of domestic violence assault against Heikkinen. First, he reasonably concluded that the plaintiff had caused bodily injury or offensive physical contact to Heikkinen and did so, at a minimum, recklessly. Although Heikkinen described herself as the "more aggressive" one in the conflict and stated that she broke the plaintiff's garage door opener on the floor and hit him on the chest before he grabbed her by the arms, pushed her, and told her to get out of the house, she reported that the plaintiff had grabbed her by the neck, was physically pushing her out of the house, and pushed her down the stairs onto a concrete floor, where she believed she had injured her ribs. Andreasen observed that she had blood on her clothing, was holding onto her ribs and complaining of pain in her ribcage, and had blotchy spots on the skin around her neck and face.

Second, Andreasen reasonably concluded that Heikkinen was a household member on the bases that she and the plaintiff were living together at least part-time and were or had been sexual partners. His mobile data search of Heikkinen's vehicle license plate indicated that her address was 90 Cornfield Point Road in Yarmouth, Maine, which was the plaintiff's address. Further, Heikkinen informed Andreasen that that she had been dating the plaintiff off and on for approximately three years, had a sexual relationship with him, had been at his home earlier that day and left to meet a friend for dinner, and had then returned and let herself into his house using the garage door opener in her vehicle.

Indeed, the plaintiff does not contest this.  Rather, he asserts that probable cause was lacking because his "use of force was justified under Maine law as self-defense and defense of premises."  Opposition at 6.  He argues that "it is widely recognized that officers must consider whether a putative arrestee's conduct was justified by law[,]" a proposition for which he cites case law from other jurisdictions, *id*. at 7, and that "[t]here was overwhelming evidence known to Officer Andreasen establishing that any force used by [the plaintiff] was justified under Maine law[,]" *id*. at 8.

Yet, "[i]n reliance on Supreme Court precedent," the First Circuit "already ha[s] rejected the proposition that a police officer has a standing obligation to investigate potential defenses or resolve conflicting accounts prior to making an arrest[,]" noting that "an officer normally may terminate his investigation when he accumulates facts that demonstrate sufficient probable cause" and "can justifiably rely upon the credible complaint by a victim to support a finding of probable cause." *Holder*, 585 F.3d at 505 (citations and internal punctuation omitted).

The First Circuit clarified that "the general rule that an officer need not resolve possible defenses or conflicting accounts is qualified only in limited" and "highly idiosyncratic circumstances" – for example, when, in *B.C.R. Transport Co. v. Fontaine*, 727 F.2d 7 (1st Cir. 1984), "police officers effected an arrest by relying upon an incoherent individual's allegations without further investigation."  *Id*. at 505-06 (citations and internal quotation marks omitted).  Otherwise, "[t]he rule . . . applicable in the wide mine-run of cases[] is that once a law enforcement officer unearths sufficient facts to establish probable cause, he has no constitutional duty either to explore the possibility that exculpatory evidence may exist or to conduct any further investigation in hope of finding such evidence."  *Id*. at 505 (citation and internal quotation marks omitted).

In *Holder*, the First Circuit found no basis on which to deviate from the general rule applicable in the wide mine-run of cases, concluding that, although a husband arrested for simple assault contended that he had a viable defense, having informed a police officer that he had used force only in response to his wife's use of force against him, see *id.*, at 502-03, 505, the officer had no duty to investigate further, *see id.* at 506.  The First Circuit reasoned, "The fact that [the husband and wife] were not on good terms and had given somewhat differing accounts of the encounter did not render unreasonable [the officer's] conclusion that it was fairly probable that [the husband] had committed a simple assault."  *Id.* (footnote omitted).

The plaintiff seeks to distinguish *Holder* on the basis that Andreasen was not presented with conflicting claims regarding what happened but, rather, "information overwhelming[ly] point[ing] to the conclusion that [the plaintiff's] use of force was justified[.]"  Opposition at 9.  He asserts that, in this case, "the absence of probable cause was obvious from the complainant's own statements to the officer, and then bolstered by the officer's own observations when making the arrest."  *Id.*  Yet, the plaintiff falls short of demonstrating the existence of a genuine issue of *material* fact that the merit of his justifications for his use of force should have been obvious to Andreasen.[18]

The plaintiff contends that it should have been apparent to Andreasen that his use of force against Heikkinen was justified as self-defense pursuant to 17-A M.R.S.A. § 108(1) or as defense of premises pursuant to 17-A M.R.S.A. § 104(1).  *See* Opposition at 6-12.  Section 108(1) provides:

> A person is justified in using a reasonable degree of nondeadly force upon another
> person in order to defend the person . . . from what the person reasonably believes

---

[18] The plaintiff notes that, in *B.C.R. Transport*, the First Circuit stated that "'whether or not probable cause exists in any given case invariably depends on the particular facts and circumstances of that case, a question to be resolved by the trier of fact.'"  Opposition at 5 (quoting *B.C.R. Transport*, 727 F.2d at 10).  However, as the defendants point out, *see* Reply at 1, the First Circuit subsequently clarified that, "when the underlying facts claimed to support probable cause are not in dispute, whether those 'raw facts' constitute probable cause is an issue of law" for the court to decide, *Holder*, 585 F.3d at 504 (citation omitted).

> to be the imminent use of unlawful, nondeadly force by such other person, and the person may use a degree of such force that the person reasonably believes to be necessary for such purpose.

17-A M.R.S.A. § 108(1) (Westlaw through 2019 2d Reg. Sess.).  Section 104(1) provides:

> A person in possession or control of premises or a person who is licensed or privileged to be thereon is justified in using nondeadly force upon another person when and to the extent that the person reasonably believes it necessary to prevent or terminate the commission of criminal trespass by such other person in or upon such premises.

*Id*. § 104(1) (Westlaw through 2019 2d Reg. Sess.).  In turn, as relevant here, "[a] person is guilty of criminal trespass if, knowing that that person is not licensed or privileged to do so, that person . . . [r]emains in any place in defiance of a lawful order to leave that was personally communicated to that person by the owner or another authorized person."  *Id*. § 402(1)(D) (Westlaw through 2019 2d Reg. Sess.).

The plaintiff asserts that Heikkinen's own statements to Andreasen established that he had acted in self-defense or defense of premises, given her report that (i) she entered the plaintiff's house without his knowledge in a "very upset" state while he was sleeping to examine his cell phone, (ii) she broke the garage door opener on the floor and hit him on the chest after learning that he had been communicating with another woman, (iii) he used no force until she struck him, (iv) she fought back when he attempted to remove her from the house after ordering her to leave, reentering the house after he had pushed her out, and (v) she described herself as the "more aggressive" one in the fight.  Opposition at 8-9.  He contends that his own report to Andreasen was consistent with that of Heikkinen, only bolstering the conclusion that he had acted in self-defense or defense of premises.  *See id*.

Nonetheless, that Heikkinen struck the plaintiff first, resisted his efforts to remove her from the residence, and described herself as the "more aggressive" in their altercation did not oblige

Andreasen to conclude that the plaintiff had a viable claim of self-defense, vitiating probable cause for the arrest.  As the defendants argue, *see* Reply at 1-4, Andreasen properly considered the totality of the circumstances, including Heikkinen's report that the plaintiff had grabbed her neck and pushed her down the stairs, the credibility of which was bolstered by the appearance of blotches on her neck and the fact that she was holding her ribs and complaining of pain.  At the least, as an objective matter, this called into question whether the plaintiff had used a "reasonable" degree of force in self-defense.

Nor did Andreasen's interaction with the plaintiff at his residence prior to his arrest make plain that the plaintiff had a self-defense justification.  That the plaintiff showed Andreasen wounds on his arm, hand, and chest sustained in the altercation with Heikkinen did not oblige Andreasen to reconsider whether Heikkinen was the predominant aggressor in view of her report, corroborated by her appearance, that the plaintiff had grabbed her neck and pushed her down the stairs.  And that Andreasen informed the plaintiff that he was arresting him for pushing the plaintiff, not for grabbing her neck, did not preclude Andreasen (and does not preclude this court) from considering the neck grab in assessing probable cause.  *See, e.g., Devenpeck*, 543 U.S. at 153 (officer's subjective state of mind irrelevant, apart from facts known at time of arrest).

Likewise, with respect to defense of premises, that Heikkinen informed Andreasen that she had entered the plaintiff's home without his knowledge and refused to comply with his order to leave did not oblige Andreasen to conclude that the plaintiff had a justification that vitiated probable cause.  Based on the information known to Andreasen at the time of the plaintiff's arrest, he reasonably could have concluded that Heikkinen lived at least part-time with the plaintiff and that she entered his home without his knowledge in the sense that he was asleep, not that she lacked permission to be there.  The mere fact that the plaintiff ordered her to leave did not transform her

continued presence into a criminal trespass warranting the use of force against her.  *See, e.g.*, 17-A M.R.S.A. § 402(1)(D) (Westlaw) ("A person is guilty of criminal trespass if, *knowing that that person is not licensed or privileged to do so*, that person . . . [r]emains in any place in defiance of a lawful order to leave that was personally communicated to that person by the owner or another authorized person.") (emphasis added).

At bottom, the facts known to Andreasen at the time of the plaintiff's arrest, even viewed in the light most favorable to the plaintiff for purposes of summary judgment, paint a gray, rather than black-and-white, picture of whether the plaintiff had viable self-defense or defense of premises justifications for the use of force for which he was arrested.  As in *Holder*, "there was no reason, inherent in the situation," for Andreasen to believe that the plaintiff had a justification for his use of force that vitiated probable cause for his arrest.  *Holder*, 585 F.3d at 505.  This, in turn, places this case within "[t]he rule . . . applicable in the wide mine-run of cases[] . . . that once a law enforcement officer unearths sufficient facts to establish probable cause, he has no constitutional duty either to explore the possibility that exculpatory evidence may exist or to conduct any further investigation in hope of finding such evidence."  *Id.* (citation and internal quotation marks omitted).[19]

### 2.  Qualified Immunity

In the alternative, even if Andreasen should have concluded that the plaintiff had a successful defense vitiating probable cause, he is entitled to qualified immunity.

---

[19]  That Andreasen agreed *at his deposition* that the plaintiff had a right as the owner of the Yarmouth home to exclude Heikkinen, *see* Plaintiff's Additional SMF ¶ 32; Defendants' Reply SMF ¶ 32, does not raise a genuine issue of material fact whether Andreasen had probable cause to arrest him.  Based on the information known to him at the time of the arrest, Andreasen reasonably could have concluded that Heikkinen was a resident of the plaintiff's home at least part-time.

As the defendants argue, *see* Reply at 5, the plaintiff falls short of carrying his burden "to identify either controlling authority or a consensus of cases of pervasive authority sufficient to signal to a reasonable [official] that particular conduct would violate a constitutional right[,]" *Norton*, 955 F.3d at 184.  Tellingly, as the defendants point out, *see* Reply at 5, the plaintiff argues that the First Circuit *likely would hold* that "probable cause to arrest does not exist if either (a) the officer knows that a justification defense would apply, or (b) the evidence known to the officer supporting a justification defense is so overwhelming that a reasonable person would not believe that the suspect had in fact committed a crime[,]" Opposition at 8, effectively conceding that the First Circuit has not made this clear.

The plaintiff also observes that in *Brady v. Dill*, 187 F.3d 104 (1st Cir. 1999), the First Circuit recognized that "an officer may not 'treat evidence of innocence with impunity[.]'" *Id*. at 7-8 (quoting *Brady*, 187 F.3d at 114).  However, in the cited passage, the First Circuit addressed an officer's responsibility to provide known exculpatory information to a prosecutor or judicial officer, clarifying that "the Constitution imposes no parallel duty on a police officer to function as a decisionmaker in order to determine the dissipation *vel non* of probable cause or the actual innocence of a person in custody."  *Brady*, 187 F.3d at 114-15.

Nor, for the reasons discussed above, has the plaintiff shown that this qualifies as a "rare obvious case" in which "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."  *Wesby*, 138 S. Ct. at 590 (citation and internal quotation marks omitted).  Even on the plaintiff's version of events, it would not have been clear to a reasonable officer in Andreasen's shoes as of the time of the plaintiff's arrest that

probable cause was vitiated by self-defense or defense of premises or that he had a duty to investigate whether it was.[20]

In short, the plaintiff identifies no controlling case law of either the Supreme Court or the First Circuit establishing that, in circumstances similar to those Andreasen confronted, a failure to recognize or further investigate a self-defense or defense of premises justification vitiates what otherwise would have been probable cause to arrest a suspect on a domestic violence charge. Andreasen, hence, is entitled to qualified immunity.[21]

### B. Municipal Defendants

As the defendants observe, *see* Motion at 15-16, the absence of an underlying constitutional violation by Andreasen is fatal to the plaintiff's claims against the Municipal Defendants, *see*, *e.g.*, *Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002) ("If . . . the officer has inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable.").

---

[20] The plaintiff cites four cases for the proposition that there was no basis in the law for believing that he engaged in criminal conduct, only two of which constitute controlling authority for purposes of qualified immunity analysis, *Glik v. Cunniffe*, 655 F.3d 78, 88 (1st Cir. 2011), and *Ricci v. Urso*, 974 F.2d 5, 7 (1st Cir. 1992). *See* Opposition at 14. *Glik* and *Ricci* are materially distinguishable.  In *Glik*, the First Circuit upheld the denial of qualified immunity to the defendant officers, holding that probable cause to arrest a bystander for filming officers' arrest of a suspect in Boston Common in violation of Massachusetts' wiretap statute was not even arguable when the recording plainly was not "'secret.'"  *Glik*, 655 F.3d at 79-80, 88.  In *Ricci*, the First Circuit upheld the denial of the defendant officers' motion for summary judgment on qualified immunity grounds when one of the defendant officers obtained a warrant for plaintiff Dennis Ricci's arrest on the basis of an affidavit in which he averred that the police had "'intercepted'" the plaintiff "'conducting illegal gambling business'" with Richard Zanfanga, the target of an illegal gambling investigation, but the officers, on the record viewed in the light most favorable to the plaintiff, had relied solely on a search of Zanfanga's rolodex for a person with the first name "Dennis" and an unreliably conducted comparison by another defendant officer of a recording of the plaintiff's voice with a wiretap recording of that of the gambler "Dennis."  *Ricci*, 974 F.2d at 6-7.  By contrast, in this case, as discussed above, Andreasen had probable cause to believe that the plaintiff had assaulted Heikkinen, and the existence of the justification defenses on which the plaintiff relies was not self-evident, even on the record viewed in the light most favorable to him.

[21] The plaintiff also "asserts and preserves for review" an argument that "qualified immunity should be abandoned or modified," recognizing that this court is bound by existing precedent on the point.  Opposition at 14-15.  The plaintiff noted that, as of the date of his brief, a petition for certiorari was pending before the Supreme Court in the case of *West v. Winfield*, No. 19-899, seeking review of the qualified immunity doctrine.  *See id*. at 14.  That petition subsequently was denied.  *See West v. City of Caldwell*, 931 F.3d 978 (9th Cir. 2019), *cert. denied sub nom. West v. Winfield* (U.S. June 15, 2020) (No. 19-899).

As the defendants argue in the alternative, *see* Motion at 16-19, even if there were a triable issue whether the plaintiff's arrest violated his Fourth Amendment rights, the evidence, viewed in the light most favorable to the plaintiff, does not clear the "very high bar for assessing municipal liability under *Monell* [*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)][,]" *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005).  To meet that standard:

> The alleged municipal action at issue must constitute a "policy or custom" attributable to the City.  Further, the Supreme Court has imposed two additional requirements: 1) that the municipal policy or custom actually have caused the plaintiff's injury, and 2) that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as "deliberate indifference."

*Id*. (citations omitted).

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997) (citation omitted).  And, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, 563 U.S. at 62 (citation omitted).

The plaintiff contends that SOP # 1013 "reflects a deliberate indifference to an arrestee's constitutional rights because it directs officers to arrest the person who the officer believes to be the 'abuser' or the 'predominant aggressor,' even if that person's actions were justified under Maine law or are otherwise non-criminal."  Opposition at 17 (footnote omitted).  He acknowledges that SOP # 1013 directs officers to consider self-defense but notes that it does not require that they consider defense of premises.  *See id.*  Beyond this, he notes that the YPD's arrest guidelines issued pursuant to SOP # 1013 instruct officers that they *cannot* consider the ownership or tenancy rights

of either party, as a result of which they cannot consider whether a person's use of force was intended to terminate a criminal trespass following a lawful order to leave.  *See id.*

The plaintiff asserts that the YPD's training, as well, reflects deliberate indifference to arrestees' rights because it incorrectly presumes that "family or household members," defined to include those who merely have or have had a sexual relationship, have a right to be on the property at which an alleged domestic violence assault takes place, precluding any consideration of defense of premises.  *See* Opposition at 18.  He notes that even Chief Morrill testified that he could not explain why defense of premises was not included in the predominant aggressor flowchart and did not know whether the information in the training was compliant with Maine law.  *See id.*

The plaintiff posits that, whatever instruction Andreasen may have received at the MCJA "was overshadowed by the Town of Yarmouth's own standard operating procedures, SOP # 1013, as supplemented by the predominant aggressor training administered just a month before the arrest."  *Id.* at 20.  Based on this record, he argues, "a jury could determine that the deprivation of [the plaintiff's] constitutional rights was caused by the unconstitutional policies and practices" of the YPD.  *Id.*

The plaintiff adduces no evidence that the Municipal Defendants were deliberately indifferent to a *known* risk that their policy, guidelines, or training would lead to a deprivation of a suspect's constitutional rights.  It is undisputed that, prior to receiving the Notice of Claim in this case, the YPD was unaware of any complaints against its police officers relating to alleged unlawful arrests for domestic violence assault or the determination of the predominant aggressor in domestic violence cases, and Chief Morrill was unaware of any complaints made against Andreasen for any reason.

Nor does the plaintiff adduce evidence raising a genuine issue that such a risk should have been obvious to the Municipal Defendants.  While SOP # 1013 and the May 2018 domestic violence training highlighted only the possibility of a self-defense justification, they did not preclude consideration of defense of premises.  The distinction was rational: self-defense potentially is applicable in any domestic violence case, while defense of premises is not.

Admittedly, the YPD's guidelines go further, directing that officers not consider ownership or tenancy rights.  Yet, while this is troubling, it does not suffice to render the risk that the guidelines would lead to the deprivation of a suspect's constitutional rights obvious in view of the First Circuit's overarching guidance that, in "the wide mine-run of cases[,]" once an officer has probable cause to make an arrest, he or she has no constitutional duty to investigate a suspect's possible innocence, including the possible applicability of justifications.  *Holder*, 585 F.3d at 505 (citation and internal quotation marks omitted).

### IV.  Conclusion

For the foregoing reasons, the defendants' motion for summary judgment as to all three remaining counts is **GRANTED**.

Dated this 18th day of October, 2020.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge